## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
-----------------------------------x
LESTER GORHAM,                     :
                                   :
            Plaintiff,             :
                                   :
v.                                 :   Civil No. 12cv58 (AWT)
                                   :
TOWN OF TRUMBULL BOARD OF          :
EDUCATION,                         :
                                   :
            Defendant.             :
-----------------------------------x
```

### RULING ON MOTION FOR SUMMARY JUDGMENT

The plaintiff, Lester Gorham ("Gorham"), brings this action against the defendant, Town of Trumbull Board of Education (the "BOE"), alleging that the BOE discriminated against him by terminating his employment based on his race (African American), color (black), and age (46), in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended by the Civil Rights Act of 1991 ("Title VII"), the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 et seq. ("ADEA"), and the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 et seq. ("CFEPA"). The plaintiff further alleges that the defendant retaliated against him by not reinstating him after he filed a charge of discrimination with the Commission on Human Rights and Opportunities ("CHRO"). The defendant moves for summary judgment with respect to all claims. For the reasons set forth below, the

motion is being granted.

## I.    Factual Background

In August 2003, Gorham was interviewed by Stephen Kennedy ("Kennedy"), who is the BOE's plant administrator. Kennedy recommended to the BOE's superintendent, Ralph M. Iassogna ("Iassogna"), that Gorham be hired for the position of custodial floater. The defendant contends that the terms and conditions of the plaintiff's employment were governed by a collective bargaining agreement between the BOE and the plaintiff's union. The agreement provides a four-step procedure in the event an employee is disciplined or terminated. The first step provides that the employee "shall present to the employee's supervisor . . . all facts available pertaining to the problem or incident . . . ." (Mem. of Law in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Mem."), Ex. N, Doc. No. 38-16, at 19.) The second step provides that "[i]f either party feels there should be further review, the facts pertaining to the problem shall [be] represented to the Plant Administrator . . . ." (Id.) The third step provides that "[i]f either party still feels further review is necessary, it must request a hearing from the Superintendent of Schools . . . ." (Id.) Finally, the fourth step provides that if either the union or the BOE "feels that further review is justified, such party must submit the matter to arbitration . . . ." (Id. at 20.) The plaintiff denies that the

terms and conditions of his employment were governed by a collective bargaining agreement as it relates to his termination in or about November 2010.

Gorham began his employment with the BOE on August 25, 2003. New hires, such as Gorham, are placed on a 180-day probationary period, but the BOE extended Gorham's probationary period for 30 days on the basis of some performance issues.[1] Subsequently, the BOE determined that Gorham was performing his duties satisfactorily, and his probationary period ended on March 22, 2004. In March 2007, Gorham was promoted to the position of night custodian at Trumbull High School. Gorham was supervised by Craig Schneider ("Schneider"), who is the BOE's night custodial supervisor. Gorham's performance showed improvement after the initial probationary period, and he received raises and promotions. Gorham continued to be employed by the BOE until November 19, 2010, when he resigned. The plaintiff denies he voluntarily resigned and maintains that he was constructively discharged.

There is an established understanding among the employees in the custodial department that they may take items found in

---

[1] The defendant states that in February 2004 the plaintiff "was disciplined and placed on probation for borrowing money from staff and co-workers and inadequate performance." (Def.'s Local Rule 56(a)1, Doc. No. 38-1, ¶ 6.) However, the evidence shows that Gorham's performance issues occurred during his initial 180-day probationary period. Consequently, the BOE "decided to extend [his] probation for 30 days." (Def.'s Mem., Ex. F, Doc. No. 38-8.) Therefore, the plaintiff was not "placed on probation."

the trash.[2] With respect to items in the Lost and Found, the custodial staff is directed by their supervisors not to take any items from the Lost and Found until the accumulation of the items has become such that it overflows into the hallway. The custodial staff is then directed by a school administrator to place the items in a plastic bag to be donated to Goodwill.

### A.    The Incident

On or about November 4, 2010, Felix Dausilio ("Dausilio"), a night custodian, found a case for a musical instrument while cleaning the band room. The instrument case was in the garbage, and it looked like garbage. Dausilio did not open the case to see what was inside. He put the case on top of a barrel that he was wheeling to the loading dock. Dausilio called Schneider and asked Schneider what he should do with the instrument case. Schneider asked Dausilio to bring the instrument case to him because he wanted to look at it. Dausilio and Schneider met "in the custodial hall." (Def.'s Mem., Ex. G, Affidavit of Craig Schneider, Doc. No. 38-9, ¶ 5.) Schneider observed that the instrument case looked old and worn, but he did not open it to look inside. Schneider asked Dausilio to put the instrument case on the loading dock, which was where custodians typically put

---

[2] The defendant states that this understanding applies only to items that are clearly of no value whereas items of questionable value may not be taken unless authorized by a supervisor. The plaintiff agrees that the unwritten policy allows custodians to take items from the trash, sometimes without approval, but disagrees as to the conditions under which custodians would need prior approval to take items from the trash.

items that required a determination as to their value. Schneider planned to speak to Peter Horton, the music director at Trumbull High School, about the instrument case.

After leaving Schneider, Dausilio saw Gorham in the hallway.[3] Gorham looked at the instrument case, and Dausilio asked him whether he wanted it. Gorham opened the instrument case and looked inside. Gorham then took the instrument case and walked away. Dausilio did not see the inside of the case because he was standing at the back of the barrel.

Gorham testifies that he was bringing garbage to the dumpster on the loading dock and saw a brown case in the dumpster. The case was clearly worn out. He opened the case and saw a saxophone.[4] Gorham considered it garbage because it was in the dumpster and so he took it home with him thinking maybe the church could use it, in accordance with the established understanding that custodians may take items in the trash.

On the following day, November 5, 2010, Horton approached Schneider and asked about a missing musical instrument that

---

[3] The defendant states that, "After the case was placed on the loading dock, Mr. Dausilio saw Plaintiff opening the instrument case (although did not see what was inside), and saw Plaintiff walking away with it." (Def.'s Local Rule 56(a)1, Doc. No. 38-1, ¶ 23.) Dausilio's affidavit states, "[A]s I walked away [from Schneider], I saw Lester Gorham in the hallway. Lester looked at the instrument case and I asked Lester if he wanted the instrument case." (Def.'s Mem, Ex. H, Affidavit of Felix Dausilio ("Dausilio Aff."), Doc. No. 38-10, ¶ 9.)
[4] The record contains inconsistencies concerning whether the instrument is a trumpet, horn, or saxophone. The parties seem to agree that it is a saxophone so for purposes of this motion, the court assumes the instrument is a saxophone.

belonged to a student. Schneider was told that the musical instrument was a family heirloom. Schneider and Horton approached Dausilio to ask about the instrument case. Dausilio told them that Gorham had it. Schneider also questioned other custodians, including Ed Bike ("Bike"), the head custodian at Trumbull High School, about whether they knew anything about a missing musical instrument.

Schneider questioned Gorham. At first, Gorham denied having knowledge of the matter. Later, Gorham told Schneider that he had given the instrument to someone at his church; then Gorham claimed that he had sold the instrument; and finally, Gorham told Schneider that he sold the instrument to a pawn shop. Schneider asked Gorham to bring the instrument back to the school.

Bike also asked Gorham about the missing instrument. Gorham told Bike that he had taken the instrument case, and that it looked like trash. Bike asked Gorham to bring back the instrument case, which Gorham did. When Gorham returned the instrument case, Bike observed that the case appeared old and worn but the instrument inside the case was polished. Bike then contacted Kennedy to inform him about what had happened.

Gorham states that he never denied having knowledge of the matter, and he brought the instrument case back once he became aware that people were looking for it. Gorham states that he

never told Schneider that he sold the instrument to a pawn shop.

**B.  The Investigation**

After being informed of the incident, Kennedy conducted an investigation, which included speaking with Gorham directly. Kennedy states that Gorham told him the following:

> a) [Gorham] took home a musical instrument in its case on November 4, 2010;
>
> b) [Gorham] knew Craig Schneider had asked Felix Dausilio to separate the item from the trash and set it aside;
>
> c) [Gorham] opened the case and saw the instrument before he took it, and he admitted that he believed the instrument would have value;
>
> d) [Gorham] took the instrument home . . . and said he gave it to someone else; and
>
> e) [Gorham] sold the instrument . . . .

(Def.'s Mem., Ex. B, Affidavit of Stephen Kennedy ("Kennedy Aff."), Doc. No. 38-4, ¶ 13.)

Gorham denies that Kennedy "conducted an investigation." (Affidavit of Lester Gorham ("Gorham Aff."), Doc. No. 42-2, ¶ 31.) Instead, Gorham states that Kennedy "engineered a pretext to terminate [his] employment." (Id.)

Kennedy states that, as a part of his investigation, he also watched a surveillance camera recording from November 5, 2010 that shows Gorham taking home a coat[5] from the school's Lost

---

[5] The court notes that the parties sometimes refer to the item from the Lost and Found as a jacket and other times refer to the item as a coat. For purposes of the instant motion, the court assumes that the item is a coat.

and Found and a dry mop from the custodial women's lavatory that was used as a storage area. The video shows that after the custodial staff left the loading dock at approximately 11:00 p.m., Gorham appeared to check outside several times. He then went into the custodial storage room, came out with a large garbage bag, and went into the custodial break room. The video shows that Gorham went to the Lost and Found shelves in the hall, looked over the shelves, picked up a coat, examined it, and took it into the custodial break room. The video also shows that Gorham went into the custodial women's lavatory that was used as a storage area for custodial equipment, took a small dry mop belonging to another custodian, Elaine Schwab ("Schwab"), and went back to the custodial break room. Gorham then left the break room with a garbage bag that was "puffy" at the bottom and had a dry mop handle sticking out of it. The video shows that Gorham went to the loading dock and placed the bag in an empty garbage barrel.

When Kennedy questioned Gorham about the events in the November 5, 2010 video, Gorham stated that he had placed the coat in the bag along with the dry mop and took these items. When Kennedy asked Gorham to explain his conduct, Gorham stated, "I guess I got too comfortable." (Kennedy Aff., Doc. No. 38-4, ¶ 18.) Gorham explained that he took the coat from the Lost and Found because it had been there several weeks. When Kennedy

asked Gorham whether video surveillance would support his explanation, Gorham then said that many times items sit in the Lost and Found for weeks.

Gorham testifies that he had permission from Schneider to borrow the dry mop because he was doing some work at home, and he brought the mop back. As to the coat, Gorham testifies that Schneider had asked whether anybody wanted anything from the Lost and Found rack since the items had been there for a while. Gorham further states that the video is not proof of theft because as a custodian, he had permission to put items into and/or remove them from the Lost and Found.

Kennedy and Schneider also learned that Gorham approached Schwab, and asked to borrow money to get a violin out of a pawn shop. Schwab states that Gorham asked to borrow $500;[6] that she was told the violin had been thrown away; and that he had taken it to a pawn shop. Gorham denies that he approached Schwab to borrow money to get a violin out of a pawn shop.

In a letter dated November 16, 2010, Kennedy notified Gorham that a disciplinary hearing was scheduled for November 19, 2010; that Gorham was charged with, inter alia, "theft of items belonging to a public entity," "dishonesty and lying to [his] supervisors," and "violation of the trust inherent in [his]

---

[6] The record contains a discrepancy as to whether Gorham asked to borrow $500 or $150. However, this is not a material fact for purposes of the instant motion.

position," (Def.'s Mem., Ex. C (the "November 16 Letter"), Doc. No. 38-5, at 1); that Gorham would have an opportunity to present evidence, testimony, or other information at the disciplinary hearing; that he should have a union representative or any representation of his choice present; and that possible disciplinary measures included suspension or termination of his employment. In addition, Kennedy detailed the information he collected during his investigation as follows:

1. You took home a musical instrument in its case on November 4, 2010.

2. You knew Craig had asked Felix to separate the item from the trash and set it aside.

3. You opened the case and saw the instrument before you took it. By your own testimony, you admitted you thought it would have value.

4. I inspected the instrument and it is apparent that this instrument was clearly of high quality and workmanship.

5. You took the instrument home (by your own admission) and said you gave it to somebody else.

6. You sold the instrument (since you asked a coworker for $150.00 to "buy the instrument back.").

7. You lied repeatedly to your supervisors including myself, changing your story at least 3 times when additional evidence was presented to you.

8. You portrayed this incident as an isolated incident and an error in judgment until I informed you of the video evidence of you stealing a coat from [the] Lost and Found and a dry mop from your co-worker's storeroom on November 5, 2010.

9. Based on video evidence, I saw you remove the dry

mop and coat, and place them in a garbage bag. You then placed the bag in a garbage barrel and rolled it out of the door before you left for the night. You subsequently admitted to taking these items.

10. I am concerned that you have taken other items. When I told you I was concerned about what I would find if I checked the video for each time you worked by yourself, you did not deny I would find additional incidents.

11. I am very concerned about your rationale for your actions. When I asked you why you did this, you stated, "I guess I got too comfortable."

12. You said you took the [coat] from [the] Lost and Found because it had been there for several weeks. When I asked you if you were sure that, when I reviewed the video, I would not find it had been brought to the Lost and Found that day or the day before, you amended your remarks and said many times stuff sits in the Lost and Found for weeks.

13. On November 5th, during the 45 minutes on the video, you appeared to check outside several times to see if there was anyone around before you took the items in question.

(November 16 Letter, Doc. No. 38-5, at 1-2.)

Gorham states that the letter, containing allegations sounding of criminality, demonstrates that the defendant was creating a pretext for firing him.

**C.   The Disciplinary Hearing**

On November 19, 2010, the BOE held a disciplinary hearing. In attendance were Gorham, Thomas Hughes (a union representative),[7] Kennedy, Schneider, Bike, and Rita McDougald-

---

[7] The defendant states that a union representative, Thomas Hughes, was present. The plaintiff states that a union steward, Pat (last name unknown), was

Campbell ("McDougald-Campbell"), who is a Trumbull High School principal.

Gorham's union representative proposed the possibility of a demotion and transfer to another facility as a lesser form of discipline. McDougald-Campbell expressed concerns about Gorham's lack of honesty and theft of items from the school building. McDougald-Campbell found Gorham's conduct to be disturbing given the unfettered access that Gorham had to the school facilities and property within the school buildings. Based on those concerns, Kennedy determined that a transfer was not possible. After consulting with Iassogna and McDougald-Campbell, Kennedy recommended that Gorham should be offered the opportunity to resign in lieu of termination. Iassogna and Kennedy then made the final decision[8] to offer Gorham the option of resignation in lieu of termination.

The union and the BOE then entered into a memorandum of agreement, erroneously dated August 23, 2010 (the "Memorandum of Agreement"). The Memorandum of Agreement states that after

---

present. This discrepancy does not concern a material fact for purposes of the instant motion.

[8] The defendant states in its memorandum of law that Iassogna "made the ultimate decision." (Def.'s Mem., Doc. 38-2, at 16.) However, in the defendant's CHRO interrogatory answer, the defendant states that "Mr. Kennedy and the Superintendent [Iassogna] made the final decision . . . ." (Def.'s Mem., Ex. L, Doc. No. 38-14, at 4.) In addition, Kennedy's affidavit states that the decision to offer Gorham the opportunity to resign in lieu of termination was made "[i]n consultation with Ralph Iassogna . . . and Rita McDougald-Campbell . . . ." (Kennedy Aff., Doc. No. 38-4, ¶ 23.) Therefore, the court assumes, for purposes of this motion, that the final decision-makers were Iassogna and Kennedy.

meeting with Gorham and after reviewing the charges in the November 16 Letter, it was agreed that it would be in the best interests of Gorham and the BOE to allow him to resign. In return, the union would not file a grievance or unfair labor practice against the BOE. Thereafter, Gorham resigned from the BOE in a letter dated November 19, 2010.

Gorham testifies that McDougald-Campbell stated at the disciplinary hearing that he should be used as an example, and that Kennedy gave him a choice to either resign or the BOE would pursue criminal charges against him. Gorham states that he was forced to resign under duress and the treat of criminal prosecution. Gorham also states that McDougald-Campbell deliberately eavesdropped on conversations between him and his union representative, and that this demonstrates that the disciplinary hearing took place in an environment of intimidation.

Gorham further testifies that a few months after his termination, he ran into Schneider, and Schneider informed him that the instrument case ended up in the dumpster again.[9] Gorham states that other similarly situated custodians have taken items from the trash, including Craig Schneider,[10] Allan Rajensen, and others (names unknown). The plaintiff states that Schneider and

---

[9] The BOE states that Schneider was referring to the instrument case being placed on top of the trash as a practical joke by the owner's bandmates.
[10] The plaintiff spells Craig Schneider's name as Craig Snyder.

Rajensen are both Caucasian, and the BOE did not terminate their employment because they salvaged items from the trash. Furthermore, Gorham states that he was replaced by a younger white person.

The BOE states that it previously had disciplined three other custodians, two of whom were terminated, for dishonesty with respect to their workplace duties and conduct. One was a 27 year-old Caucasian male who resigned on or about November 23, 2010, after it was determined based on evidence that he had falsified his time cards; another was a 46 year-old Caucasian male who was terminated for dishonesty on or about January 21, 2010, after it was determined based on evidence that he had been texting a personal acquaintance and engaging in harassing behavior while at work; and the third was a 56 year-old Hispanic male who was suspended without pay after it was determined based on evidence that he brought a staff member to work who was not authorized to work and made misrepresentations regarding the same.

The BOE further states that Kennedy was 47 years old at the time of the conduct at issue and Caucasian; Iassogna was 65 years old and Caucasian; and McDougald-Campbell was 57 years old and African American. In addition, following Gorham's departure, there were two custodial vacancies; one was filled by a 56 year-old Hispanic male and the other by a 64 year-old Caucasian male.

## II.  Legal Standard

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. See Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994). Rule 56(a) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

When ruling on a motion for summary judgment, the court must respect the province of the jury. The court, therefore, may not try issues of fact. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975). It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." Anderson, 477 U.S. at 255. Thus, the trial court's task is "carefully limited to discerning whether there

are any genuine issues of material fact to be tried, not to

deciding them. Its duty, in short, is confined . . . to issue-

finding; it does not extend to issue-resolution." <u>Gallo</u>, 22 F.3d

at 1224.

Summary judgment is inappropriate only if the issue to be

resolved is both genuine and related to a material fact.

Therefore, "the mere existence of <u>some</u> alleged factual dispute

between the parties will not defeat an otherwise properly

supported motion for summary judgment . . . ." <u>Anderson</u>, 477 U.S.

at 247-48. An issue is "genuine . . . if the evidence is such

that a reasonable jury could return a verdict for the nonmoving

party." <u>Anderson</u>, 477 U.S. at 248 (internal quotation marks

omitted). A material fact is one that would "affect the outcome

of the suit under the governing law." <u>Id.</u> As the Court observed

in <u>Anderson</u>: "[T]he materiality determination rests on the

substantive law, [and] it is the substantive law's

identification of which facts are critical and which facts are

irrelevant that governs." <u>Id.</u> Thus, only those facts that <u>must</u>

be decided in order to resolve a claim or defense will prevent

summary judgment from being granted. When confronted with an

asserted factual dispute, the court must examine the elements of

the claims and defenses at issue on the motion to determine

whether a resolution of that dispute could affect the

disposition of any of those claims or defenses. Immaterial or

16

minor facts will not prevent summary judgment. See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Delaware & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)). Because credibility is not an issue on summary judgment, the nonmovant's evidence must be accepted as true for purposes of the motion. Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture is insufficient to defeat a motion for summary judgment." Stern v. Trustees of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 1997) (internal quotation marks omitted) (quoting Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d. Cir. 1990)). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which [a] jury could reasonably find for the [nonmovant]." Anderson, 477 U.S. at 252.

Finally, the nonmoving party cannot simply rest on the allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists. See Celotex Corp., 477 U.S. at

324. "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," Weinstock, 224 F.3d at 41, if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, who must "demonstrate more than some metaphysical doubt as to the material facts, . . . [and] must come forward with specific facts showing that there is a genuine issue for trial." Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993) (quotation marks, citations and emphasis omitted). Furthermore, "unsupported allegations do not create a material issue of fact." Weinstock, 224 F.3d at 41. If the nonmovant fails to meet this burden, summary judgment should be granted.

## III. Discussion

The plaintiff claims in his Amended Complaint that he was discriminated against when his employment was terminated because of his race, color, and age.

Title VII makes it an "unlawful employment practice for an employer . . . to discharge . . . or discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1). Under the ADEA, it is "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such
individual's age . . . ." 29 U.S.C. § 623(a)(1). The protections
of the ADEA reach individuals who are at least 40 years old. See
29 U.S.C. § 631(a). Under CFEPA "[i]t shall be a discriminatory
practice in violation of this section . . . [f]or an
employer . . . to refuse to hire . . . or to discharge from
employment any individual or to discriminate against such
individual . . . because of the individual's race, color,
religious creed, age . . . ." Conn. Gen. Stat. § 46a-60(a)(1).

Title VII claims are analyzed under the burden shifting
framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S.
792, 802 (1973). Claims of age discrimination under the ADEA are
analyzed "under the same burden shifting framework as claims
brought pursuant to Title VII . . . ." Abdu-Brisson v. Delta Air
Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001). "The analysis of
discrimination . . . under CFEPA is the same as under Title
VII." Kaytor v. Electric Boat Corp., 609 F.3d 537, 556 (2d Cir.
2010) (citing Craine v. Trinity College, 259 Conn. 625, 637 n.6
(2002)). Accordingly, the court analyzes the plaintiff's Title
VII, ADEA, and CFEPA claims together.

Under the McDonnell Douglas burden shifting framework, a
plaintiff must first make out a prima facie case by
demonstrating the following: "(1) [he] was within the protected
class; (2) [he] was qualified for the position; (3) [he] was

subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." United States v. Brennan, 650 F.3d 65, 93 (2d Cir. 2011). "[The] plaintiff's prima facie burden [i]s minimal and de minimis." Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005) (internal quotation marks omitted). Once the plaintiff establishes the elements of a prima facie case, "the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action." Brennan, 650 F.3d at 93. If the employer satisfies its burden of articulating a legitimate reason, "the presumption of discrimination drops out, and the plaintiff must prove that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Woodman, 411 F.3d at 76 (internal citation and quotation marks omitted). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

### A. Prima Facie Case

The court concludes that the plaintiff has failed to meet his de minimis burden of establishing a prima facie case. While the plaintiff has established the first three elements of a prima facie case, he has failed to demonstrate that the

circumstances under which his employment was terminated give rise to an inference of discrimination. The BOE concedes that Gorham has established the first element of a prima facie case in that he is a member of a protected class, i.e., he is African American, black, and was 46 years old at the time of the termination of his employment. Thus, the second, third and fourth elements are discussed below.

### 1. Qualified for the Position

The BOE argues that Gorham cannot establish that he was qualified for the position of night custodian because Kennedy's investigation revealed, inter alia, that Gorham took the musical instrument from the school to a pawn shop; that Gorham asked another employee for money to get the instrument out of the pawn shop; that he took a coat from the school's Lost and Found; and that he took a dry mop from the custodial closet. Gorham argues that the defendant admitted that he is qualified because Kennedy stated in his affidavit that Gorham had "received raises, promotions, and transfers as requested." (Kennedy Aff., Doc. No. 38-4, ¶ 11.)

It is "[the] plaintiff's burden of demonstrating satisfactory job performance, in accordance with the particular employer's criteria for satisfactory performance." Ruiz v. County of Rockland, 609 F.3d 486, 492 (2d Cir. 2010) (quoting Thornley v. Penton Publishing, Inc., 104 F.3d 26, 30 (2d Cir.

1997)) (internal quotation marks omitted). "[The] plaintiff must show only that he 'possesses the basic skills necessary for performance of [the] job.'" Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 92 (2d Cir. 2001) (quoting Owens v. New York City Hous. Auth., 934 F.2d 405, 409 (2d Cir. 1991)).

Where misconduct is involved, the Second Circuit has explained that there is a distinction between unsatisfactory job performance and misconduct. While "misconduct may certainly provide a legitimate and non-discriminatory reason to terminate an employee, . . . that issue is distinct from the issue of minimal qualification to perform a job." Ruiz, 609 F.3d at 492 (quoting Owens, 934 F.2d at 409) (internal quotation marks omitted). "The qualification prong must not, however, be interpreted in such a way as to shift onto the plaintiff an obligation to anticipate and disprove, in his prima facie case, the employer's proffer of a legitimate, non-discriminatory basis for its decision." Slattery, 248 F.3d at 92. Thus, "if an otherwise qualified employee is alleged to have engaged in misconduct or otherwise to have created circumstances justifying [his] termination, that conduct is appropriately evaluated, not in the prima facie 'qualifications' analysis, but rather in assessing the employer's stated neutral reason for the adverse action and the employee's pretext case." Calabro v. Westchester BMW, Inc., 398 F. Supp. 2d 281, 289 (S.D.N.Y. 2005).

Here, Gorham has met his burden with respect to the second element. Gorham's personnel file shows that he was employed by the BOE for at least ten years from August 25, 2003 to November 19, 2010; during his period of employment, he had received raises and promotions; two supervisors had stated that Gorham's job performance was satisfactory; and the BOE had admitted that "his performance was generally good and on par with his colleagues" (Def.'s Mem., Ex. O ("CHRO Answer"), Doc. No. 38-17, at 3). Based on these undisputed facts, Gorham has shown that he possessed the basic skills necessary for performance of the position of night custodian.

### 2. Adverse Employment Action

With respect to the third element, the BOE argues that Gorham did not suffer an adverse employment action because the BOE did not terminate his employment, rather he resigned. The defendant similarly argues that Gorham cannot prevail on an argument that he was constructively discharged because Gorham chose to resign. In addition, the defendant argues that Gorham had the right to post-termination grievance remedies through his union's collective bargaining agreement. Gorham argues that there was a constructive discharge because he resigned under the threat of criminal prosecution and termination was inevitable.

"Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual,

intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." Chertkova v. Connecticut Gen. Life Ins. Co., 92 F.3d 81, 89 (2d Cir. 1996). An employee is constructively discharged where he resigns in the face of inevitable termination. See id., 92 F.3d at 85-89 (finding that the plaintiff had been constructively discharged where, inter alia, she was told that "she would be fired immediately if, over the course of two years, she did not maintain satisfactory performance levels"); Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1188 (2d Cir. 1987) (finding that supervisor's statement to plaintiff that he "would be fired at the end of the 90-day probationary period no matter what" was sufficient evidence to support a finding of constructive discharge); Grey v. City of Norwalk Bd. of Ed., 304 F. Supp. 2d 314, 324 (D. Conn. 2004) (finding that supervisor's statement to plaintiff to "watch out for herself" and warning that her job would be eliminated at the end of the year was sufficient to support an inference of constructive discharge); Silverman v. City of New York, 216 F. Supp. 2d 108, 115-16 (E.D.N.Y. 2002) ("[A] number of courts in this circuit have held that threats of termination may be sufficient to establish constructive discharge."), aff'd, 64 F. App'x 799 (2d Cir. 2003).

   Gorham has established that there was a constructive discharge, i.e., he resigned in the face of inevitable

termination, and therefore, he was subject to an adverse
employment action. The November 16 Letter informed Gorham that
"[a]s a result of the findings of my investigation thus far,
appropriate disciplinary measures include possible suspension or
termination of your employment with the [BOE]." (Pl.'s Mem. of
Law in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Mem."), Ex. F,
Doc. No. 42-9, at 2.) Gorham testified that during the
disciplinary hearing, Kennedy said "Lester, you're better off
resigning right now; if not, we'll have you charged." (Pl.'s
Mem., Ex. B ("Gorham Dep."), Doc. No. 42-3, at 46:9-11.) The
BOE's CHRO Answer states, "[A]fter a disciplinary hearing . . .
the Complainant resigned in lieu of termination and arrest."
(CHRO Answer, Doc. No. 38-17, at 2.) Gorham further testified
that:

> [Kennedy] said, you either resign for personal reasons
> or we'll have you charged. . . . The Union guy took me
> in the hall three times. Lester, this is tough. If you
> don't sign -- resign, they'll not only have you
> charged; even if you feel like you're right, you're
> making the right -- you feel you're right, you'll
> still be messed up. The word, I think they call it the
> loss when you can't find the work.

(Gorham Dep., Doc. No. 42-3, at 47:21-48:4.) Following the
November 19, 2010 disciplinary hearing, Gorham resigned that day.

    In addition, the Memorandum of Agreement shows that the
Union, on behalf of Gorham, bargained for the BOE's promise not
to pursue Gorham's termination. "In return for the Board of

25

Education's not pursuing Mr. Gorham's termination, the Union has agreed not to pursue this matter in any way . . . ." (Pl.'s Mem., Ex. G, Doc. No. 42-10.) This is corroborated by Kennedy, who states that "Mr. Gorham and his union decided that it was in Mr. Gorham's best interest to resign in lieu of the Town of Trumbull Board of Education pursuing Mr. Gorham's termination." (Kennedy Aff., Doc. No. 38-4, ¶ 24.) Therefore, the court finds that the record demonstrates a constructive discharge, since a reasonable person in Gorham's shoes would have felt compelled to resign.

The defendant's reliance on Stetson v. NYNEX Serv. Co., 995 F.2d 355 (2d Cir. 1993), is misplaced. Unlike here, the employer in Stetson "never either expressly or impliedly suggested that [the plaintiff's] employment would be terminated." Id., 995 F.2d at 361. Also unavailing is the defendant's argument that an employee's right to post-termination grievance remedies negates a finding of constructive discharge. The defendant relies on distinguishable cases from other circuits. See Ross v. City of Perry, 396 F. App'x 668, 670 (11th Cir. 2010) (plaintiff could have chosen to be terminated and then appeal his termination to the city manager); Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 187-88 (4th Cir. 2004) (no constructive discharge where employee's complaints revolved around someone who had no supervisory or managerial power over employee and where employee was seeking alternative employment prospects prior to

resignation); <u>Mitchell v. City of Natchez</u>, 5:11-cv-137
(DCB)(RHW), 2013 WL 139337, *6 (S.D. Miss. Jan. 10, 2013) (no
constructive discharge where employee resigned after supervisor,
who had no final authority to terminate employee, expressed an
intention to recommend employee's termination); <u>Dodge v. City of
Belton</u>, 10-0038-CV-W-ODS, 2011 WL 529708, *2-3 (W.D.Mo. Feb. 4,
2011) (no constructive discharge where employee resigned before
a pre-termination hearing and after supervisor, who had no final
authority to terminate employee, expressed an intention to
recommend termination).

### 3. Inference of Discrimination

With respect to the fourth element, the plaintiff has
failed to proffer evidence that could show that he was treated
differently than similarly situated custodians or that the
defendant's decision was motivated by animus toward a protected
class such that the court would be able to draw an inference of
discrimination.

#### a. Disparate Treatment

Gorham argues that he was treated differently from "white
and/or younger employees" (Am. Compl., Doc. No. 15, ¶ 31)
because he was terminated for taking an item from the trash,
notwithstanding an understanding among the custodial staff that
they could take items found in the trash.

"A plaintiff may raise [an inference of discrimination] by

27

showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000). When considering whether a plaintiff has raised such an inference, "the plaintiff must show [he] was similarly situated in all material respects to the individuals with whom [he] seeks to compare [him]self." Id. (quoting Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997)) (internal quotation marks omitted). "An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." Ruiz, 609 F.3d at 493-94. "[T]he standard for comparing conduct requires a reasonably close resemblance of facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." Graham, 230 F.3d at 40.

Here, Gorham falls short of meeting his de minimis burden. Gorham alleges that "Craig Snyder, Allan Rajensen, (both Caucasian) and others (names unknown)" (Am. Compl., Doc. No. 15, ¶ 22) have taken items from the dumpster. Gorham also asserts that the BOE has not terminated white and/or younger employees for taking items from the trash, based on the BOE's admission, in an interrogatory response, that it has not terminated any employee for taking items from the trash. Aside from Gorham's

conclusory assertions, he has not proffered any evidence concerning Schneider, Rajensen, or any other employee that would allow the court to assess whether any of them engaged in comparable conduct. In addition, because Schneider is a custodial supervisor, to establish that he was similarly situated to Schneider, Gorham would have to demonstrate that he was subject to the same performance evaluation and discipline standards as his supervisor. But Gorham has not proffered any evidence that could show that he is similarly situated in all material aspects to Schneider.

While Gorham's burden to establish a prima facie case of discrimination is minimal, he "cannot meet this burden through reliance on unsupported assertions." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). Thus, the court concludes that Gorham has failed to raise an inference of disparate treatment because of his race, color, or age.

### b. Racial Animus

The plaintiff argues that a comment McDougald-Campbell made during the disciplinary hearing supports an inference of racial animus. Specifically, she said "use him for [an] example." (Pl.'s Mem., Doc. No. 42, at 20; Gorham Dep., Doc. No. 42-3, at 47:17.) On its face, this remark reflects no racial animus, so it does not constitute direct evidence of discriminatory animus. See De La Cruz v. New York City Human Res. Admin. Dep't, 884 F.

Supp. 112, 116 (S.D.N.Y. 1995) ("In a discrimination case, explicit and unambiguous statements of racial . . . hostility would be direct evidence."), aff'd, 82 F.3d 16 (2d Cir. 1996). There is also no other remark in the record that would support an inference that McDougald-Campbell's statement had a discriminatory overtone or that discriminatory animus played a role in McDougald-Campbell's assessment of Gorham's conduct. Moreover, even if the court were to assume that McDougald-Campbell's remark was racially charged, it is only one such comment, and would be characterized as a stray remark. See Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir. 1998) ("Stray remarks, even if made by a decision maker, do not constitute sufficient evidence [to support] a case of employment discrimination."). A single, racially-neutral comment cannot give rise to an inference of discrimination based on race or color.

Gorham also points to the fact that neither of his replacements is black. However, "[t]hat one's replacement is of a different race, sex, or age may help a plaintiff to establish a prima facie case, it is however insufficient by itself to raise an inference of discrimination." Pleener v. New York City Bd. of Ed., 311 F. App'x 479, 481 (2d Cir. 2009) (quoting Carson v. Bethlehem Steel Corp., 82 F.3d 157, 159 (7th Cir. 1996)). Therefore, in light of the fact that Gorham has not provided any

other evidence that would support an inference of racial discrimination, the mere fact that his replacement was not a member of the same protected class is insufficient to support an inference of discrimination.

### c. Age-Related Animus

There is also no evidence that could support an inference that Gorham's employment was terminated because of his age. For example, there was no remark concerning Gorham's age made by anyone during the investigation or the disciplinary hearing. Nor does the record contain any stray or isolated remarks. Gorham states that "[he has] reason to believe [his replacement] was younger than [him]." (Gorham Aff., Doc. No. 42-2, ¶ 48.) After the termination of Gorham's employment, there was no outside hire or transfer to replace him for some time. The BOE, however, has provided evidence that there were two vacancies around the time Gorham was terminated; one was filled by a 56 year-old Hispanic male, and the other by a 64 year-old Caucasian male. The BOE also has provided evidence concerning additional personnel decisions following the termination of Gorham's employment. Gorham asserts that the defendant's failure to identify a specific person who replaced him creates a genuine issue of material fact. However, Gorham has not produced any evidence to support his asserted belief. Therefore, this dispute does not constitute a genuine issue of material fact.

**B. Defendant's Legitimate, Nondiscriminatory Reason**

Even if Gorham could establish a prima facie case of race, color, and age discrimination, the BOE has set forth a legitimate, non-discriminatory reason for terminating his employment and, as discussed below, Gorham has failed to produce evidence that could show that the BOE's reason is a pretext for discrimination.

The record establishes that the missing instrument case prompted Kennedy to conduct an investigation, which included speaking with Gorham and reviewing surveillance camera videos. Based on his investigation, Kennedy concluded, <u>inter</u> <u>alia</u>, that Gorham changed his story concerning the musical instrument several times and that Gorham took items, i.e., a dry mop from the custodial closet and a coat from the Lost and Found, home without permission. In consulting with McDougald-Campbell and Iassogna, McDougald-Campbell expressed her concern that the musical instrument incident was not an isolated incident, and the incident was "especially disturbing given the unfettered access Mr. Gorham, as a custodian, had to the school facilities and property in the school buildings." (Def.'s Mem., Ex. M, Affidavit of Rita McDougald-Campbell ("McDougald-Campbell Aff."), Doc. No. 38-15, ¶ 9.) Based on Kennedy's investigation, the BOE concluded that Gorham committed theft and was dishonest. That conclusion led the BOE to offer Gorham resignation in lieu of

termination. Thus, the defendant has met its burden of articulating a legitimate, nondiscriminatory reason for terminating Gorham's employment.

Even assuming Gorham did not commit theft, the allegation of theft still constitutes a legitimate, nondiscriminatory reason. See Crump v. NBTY, Inc., 847 F. Supp. 2d 388, 393 (E.D.N.Y. 2012) ("[T]he relevant inquiry is not whether Plaintiff actually stole product, but rather whether Defendant has proffered a nondiscriminatory reason for firing Plaintiff. . . . [T]heft is a sufficiently legitimate nondiscriminatory reason for firing Plaintiff."); Jowers v. Family Dollar Stores, No. 09 Civ 2620(WHP), 2010 WL 3528978, at *3 (S.D.N.Y. Aug. 16, 2010) ("[Defendant's] allegation of theft constitutes a valid reason for termination.").

**C. Pretext for Discrimination**

Because the defendant has articulated a legitimate, nondiscriminatory reason for terminating Gorham's employment, "the plaintiff must prove that the legitimate reason[] offered by the defendant [was] not its true reason[], but [was] a pretext for discrimination." Woodman, 411 F.3d at 76. The court must "examine the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." Schnabel v. Abramson, 232 F.3d 83, 90

(2d Cir. 2000) (internal citation and quotation marks omitted).

Gorham argues that the BOE's stated reason for the termination is a pretext. He argues that the BOE never brought up the established understanding of allowing custodians to take items from the trash during the investigation into his alleged misconduct; that the BOE did not acknowledge this established understanding until August 17, 2012; that the defendant changed its position from claiming that Gorham committed theft to claiming that he failed to obtain approval from his supervisor prior to removing items from the trash; that he did not steal the dry mop from the custodial closet and the coat from the Lost and Found because he had permission to take these items; that the November 16 Letter contained accusations that read like a criminal indictment; and that affidavits the defendant has submitted from Kennedy, Schneider, and Bike stating that they did not give Gorham permission to take the instrument case are self-serving and were not made contemporaneously.

However, assuming arguendo that the plaintiff could create a genuine issue of material fact as to whether the reason articulated by the defendant was pretextual, "a reason cannot be proved be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993) (emphasis in original). As discussed above, the plaintiff has

34

failed to produce evidence that could support an inference of discrimination, based on either evidence that he was treated differently from similarly situated individuals or evidence of discriminatory animus on the part of the defendant towards a protected class.

Moreover, the defendant points to evidence that gives rise to inferences that would negate an inference of race, color, or age discrimination. With respect to age discrimination, Kennedy, McDougald-Campbell, and Iassogna were 47, 57, and 65, respectively, at the time the defendant terminated Gorham's employment. Thus, each was older than Gorham. An inference against age discrimination can be drawn "where the person who participated in the allegedly adverse decision is also a member of the same protected class." Drummond v. IPC Intern., Inc., 400 F. Supp. 2d 521, 532 (E.D.N.Y. 2005) (citing Marlow v. Office of Court Admin., 820 F. Supp. 753, 757 (S.D.N.Y 1993), aff'd, 22 F.3d 1091 (2d Cir. 1994)).

Likewise, with respect to racial discrimination, the same actor inference can be drawn because Kennedy and Iassogna participated in both the decision to hire Gorham and in the decision to terminate his employment. See Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997) ("[S]ome factors strongly suggest that invidious discrimination was unlikely . . . [w]hen the person who made the decision to fire was the same

person who made the decision to hire . . . .”). Such an inference is less compelling here considering the length of time, i.e., 7 years, that elapsed between Gorham's hiring and the termination, but the inference may nevertheless be drawn. See Carlton v. Mystic Transp., Inc., 202 F.3d 129, 138 (2d Cir. 2000) (“[T]he inference is less compelling when a significant period of time elapses between the hiring and the firing.”).

Thus, even assuming arguendo that Gorham could create a genuine issue of material fact as to whether the reason given by the BOE for terminating his employment was pretextual, he has proffered only his own conclusory assertions, but not evidence, in support of his contention that unlawful discrimination was the real reason.

The plaintiff argues that there is significance to Schneider's comment to Gorham that “I don't know how to tell you this, but that [saxophone] ended up back in the dumpster again” (Gorham Dep., Doc. No. 42-3, at 60:14-15.), and the defendant's attempt to explain that the saxophone was placed on top of the trash “as a practical joke” played on the owner by fellow students (Pl.'s Mem., Ex. D-1 Doc. No. 42-7, at 1) as evidence that the BOE's reason is pretextual. However, Schneider made the comment to Gorham in April, months after the November 19, 2010 disciplinary hearing and resignation. Thus, the fact that the instrument was put in the trash a second time is not something

36

Kennedy, McDougald-Campbell, and Iassogna could have considered
in making a decision about the plaintiff. Gorham also argues
that the BOE contradicts itself when it accused him of "theft of
items belonging to a public entity" in the November 16, 2010
Letter and later uses the word "heirloom" to describe the
instrument and admits that it does not have possession of it.
However, Kennedy concluded after his investigation that Gorham
took a dry mop from the custodial closet, in addition to taking
a coat from the Lost and Found, without permission. Thus, the
plaintiff has proffered evidence that, at most, goes to the
issue of whether the investigation conducted by the defendant
was flawed to some degree, which is a different question from
whether the reason proffered by the defendant for terminating
the plaintiff's employment was pretextual, and an altogether
different question from whether the real reason was intentional
discrimination.

Because, even assuming arguendo that the plaintiff could
create a genuine issue of material fact as to whether the reason
articulated by the defendant was pretextual, the plaintiff has
failed to proffer evidence that creates a genuine issue of
material fact as to whether the real reason for the termination
of his employment was his race, color, or age, the motion for
summary judgment is being granted as to the plaintiff's claims
for discrimination in violation of Title VII, the ADEA, and

CFEPA.

**D. Retaliation Claim**

The Amended Complaint alleges that "[t]he defendant later retaliated against [the] plaintiff by failing to reinstate him to his position after [the] defendant had been made aware that other of its employees had acted as [the] plaintiff had, but had not been terminated and otherwise informed of the nature of the defendant's illegal actions at and during the CHRO process." (Am. Compl., Doc. No. 15, ¶ 30.) Based on that allegation, the defendant moves for summary judgment on any retaliation claim being asserted by the plaintiff.

"The McDonnell Douglas burden shifting analysis used in claims of discrimination in violation of Title VII also applies to retaliation claims brought pursuant to Title VII. . . . The same standards and burdens apply to claims of retaliation in violation of the ADEA." Ashcroft, 336 F.3d at 141 (2d Cir. 2003). "Claims under CFEPA are analyzed in the same manner as those under Title VII, including for claims of retaliation." Collins v. Connecticut Job Corps, 684 F. Supp. 2d 232, 254 (D. Conn. 2010) (quoting Kearney v. City of Bridgeport Police Dep't, 573 F. Supp. 2d 562, 573 (D. Conn. 2008)).

"To establish a prima facie case of retaliation under Title VII, a plaintiff is required to show by a preponderance of the evidence: (1) that he participated in a protected activity; (2)

the defendant knew of the protected activity; (3) he experienced an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse employment action." Collins, 684 F. Supp. 2d at 254.

The plaintiff does not respond to the motion for summary judgment as to any retaliation claim, other than stating generally that "the burden of establishing a prima facie case for discrimination/retaliation is minimal." (Pl.'s Mem., Doc. No. 42, at 31.). Therefore, the claim has been abandoned and the defendant is entitled to summary judgment on this basis alone. See Nguyen v. People's United Bank, No. 3:10-cv-455, 2011 WL 2198315, at *4 (D. Conn. Jun. 6, 2011) (granting summary judgment on, and deeming abandoned, claim that plaintiff failed to respond to in opposing summary judgment).

In any event, however, the plaintiff's theory as to why he was retaliated against, as alleged in the Amended Complaint, is that the defendant failed to reinstate him to his position after he filed a complaint with the CHRO. However, it is apparent that the plaintiff could not meet his de minimis burden of establishing a prima facie case because, inter alia, the record is devoid of any evidence that could support an inference that there was a causal connection between the plaintiff filing his CHRO complaint and the defendant failing to reinstate him to his position.

Therefore, the motion for summary judgment is being granted as to any claims brought by the plaintiff for retaliation in violation of Title VII, the ADEA, and CFEPA.

**IV. Conclusion**

For the reasons set forth above, the defendant's Motion for Summary Judgment (Doc. No. 38) is hereby GRANTED. Judgment shall enter in favor of defendant Town of Trumbull Board of Education on all the claims in the Amended Complaint.

The Clerk shall close this case.

It is so ordered.

Signed this 26th day of March 2014, at Hartford, Connecticut.

<pre>
                      _____
                               /s/
                         Alvin W. Thompson
                      United States District Judge
</pre>